_____ FILED   _____ ENTERED
_____ LODGED   _____ RECEIVED

OCT 28 2025

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

Magistrate Judge Brian A. Tsuchida

## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RONI LICONA ESCOTO,<br><br>Defendant. | CASE NO. MJ25-678<br><br>COMPLAINT for VIOLATION<br><br>21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846<br>(Felony) |

BEFORE, Brian A. Tsuchida, United States Magistrate Judge, U. S. Courthouse, Seattle, Washington.

The undersigned complainant being duly sworn states:

### COUNT ONE

### (Conspiracy to Distribute Controlled Substances)

Beginning at a time unknown, and continuing until at least October 28, 2025, in King County within the Western District of Washington, and elsewhere, RONI LICONA ESCOTO, and others known and unknown, did knowingly and intentionally conspire to distribute controlled substances, including: cocaine and methamphetamine, substances controlled under Title 21, United States Code.

Complaint - 1
*United States v. Licona Escoto / MJ25-678*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

It is further alleged that with respect to RONI LICONA ESCOTO, and his conduct as a member of the conspiracy charged in Count 1, which includes the reasonably foreseeable conduct of other members of the conspiracy charged in Count 1, involved 500 grams or more of a mixture and substance containing a detectable amount of cocaine, and 50 grams or more of mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Sections 841(b)(1)(B).

All in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## COUNT 2

### (Possession of a Controlled Substance with Intent to Distribute)

On or about October 28, 2025, in King County, within the Western District of Washington, and elsewhere, RONI LICONA ESCOTO, did knowingly and intentionally possess, with the intent to distribute, and aid and abet the possession of, with the intent to distribute, a controlled substance, including: cocaine and methamphetamine, substances controlled under Title 21, United States Code.

It is further alleged that the offense involved 500 grams or more of a mixture and substance containing a detectable amount of cocaine, and 50 grams or more of methamphetamine, its salts, isomers, or salts of its isomers.

It is further alleged that this offense was committed during and in furtherance of the offense alleged in Count 1 (Conspiracy to Distribute Controlled Substances).

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2.

//

//

//

Complaint - 2
*United States v. Licona Escoto* / MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

And the complainant states that this Complaint is based on the following information:

I, Grayson Seidel, being first duly sworn on oath, depose and say:

## AGENT BACKGROUND

1.    I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7). Specifically, I am employed as a Special Agent (SA) with the United States Drug Enforcement Administration (DEA) and have been so employed since April 2024. I am currently assigned to the Seattle Field Division. In this capacity, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801, et seq., and related offenses. I have received specialized training in the enforcement and investigation of the Controlled Substance Act. I have received over 620 hours of classroom training including, but not limited to, drug identification, drug interdiction, detection, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances. In my role as a Special Agent, I have participated in investigations of individuals who have smuggled, received, and distributed controlled substances, as well as the seizure of illegal drugs and proceeds of the sale of those illegal drugs. Furthermore, I am familiar with the ways in which drug traffickers conduct their business, including but not limited to their methods of importing and distributing drugs, their use of cellular telephones, and their use of numerical codes and code words to conduct their illegal transactions.

2.    As a DEA Special Agent, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by various traffickers in their efforts to import, export, conceal, and distribute controlled substances. I am also familiar with the manner in which drug traffickers use vehicles to conceal,

Complaint - 3
*United States v. Licona Escoto* / MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

transport, or conduct drug transactions and/or exchange drug proceeds in their unlawful operations.

3.      I have participated in investigations that involved money launderers and drug traffickers using telephones to communicate with their criminal associates and those working with law enforcement, such as confidential informants, cooperating individuals, and undercover officers. I have also conducted investigative activities related to federal wiretap investigations. As part of my experience with wiretaps, I have reviewed transcripts and line sheets (prepared by linguists) documenting the content of intercepted conversations involving the trafficking of narcotics, by persons who used some form of code to thwart law enforcement. I am familiar with how money launderers and drug traffickers speak to each other and generally conduct business. For example, I am aware that money launderers and drug traffickers discussing criminal matters over telephones often speak in code or in vague terms. I am also aware that these subjects frequently: (1) provide false or fictious subscriber information to the service providers, (2) use phones with subscriber identities other than their own, and (3) change phones to avoid detection by law enforcement. This training and experience form the basis for my opinions expressed below.

4.      The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

**SUMMARY OF INVESTIGATION**

5.      In Fall 2024, investigators from DEA Seattle and the Seattle Police Department (SPD) began a joint investigation into a drug trafficking organization (DTO) that distributes fentanyl, cocaine, methamphetamine, and heroin to others in the Western

Complaint - 4
*United States v. Licona Escoto* / MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

District of Washington. Throughout this investigation, a DEA Confidential Source (hereafter "CS1" [1]) communicated with "Robert," who investigators subsequently identified to be Jose NAVARRO HERNANDEZ, to purchase fentanyl powder, fentanyl pills, heroin, cocaine, and methamphetamine, as well as several firearms. During the investigation, CS1 would place drug orders and NAVARRO HERNANDEZ would typically send a runner to meet with CS1 and deliver the drugs. During several later deals, CS1 also acquired firearms from NAVARRO HERNANDEZ and his runners. NAVARRO HERNANDEZ and his coconspirators are charged in *United States v. Navarro Hernandez et al.,* CR25-213 KKE.

6.      In early 2025, CS1 reached out to NAVARRO HERNANDEZ looking to buy drugs in California and NAVARRO HERNANDEZ referred CS1 to "Mario" who was later identified as Marisol PEREZ DIAZ. After PEREZ DIAZ helped CS1 arrange a purchase of fentanyl through an associate near Oakland, California, CS1 continued to reach out to PEREZ DIAZ and additional controlled buys, for both fentanyl and cocaine, were conducted locally in Tukwila, WA. Each of these controlled buys also included the purchase of at least one firearm. Prior to each of these deals, CS1 communicated with

---

[1] CS1 has no criminal/administrative arrest history. Before CS1 began to cooperate with law enforcement, CS1 was engaged in money laundering and drug trafficking activity. Moreover, CS1 has acknowledged that prior to CS1's cooperation with law enforcement, CS1 was present during the collection of drug debts during which time the individual that owed the debt was assaulted by members of the DTMLO with which CS1 was previously affiliated.

CS1 understands that he/she must provide only truthful information to law enforcement investigators. To my knowledge, CS1 has not provided false information during this, or in other investigations. However, during the time that CS1 has been cooperating with law enforcement, CS1 has been counseled regarding the proper handling and/or retention of electronic evidence. CS1 has been paid in this investigation both when he/she has provided information and when he/she has engaged in undercover operations at the direction of law enforcement. CS1 is also receiving immigration benefits, including deferred action and work authorization.

CS1 lives in the community and wishes to remain anonymous for fear of reprisals and retribution. However, CS1 has expressed a willingness to testify if his/her identity could be protected.

Complaint - 5
*United States v. Licona Escoto* / MJ25-678

PEREZ DIAZ and placed the drug and firearm order with her, and then both she and her boyfriend/co-conspirator, Jordan MARTINEZ GAMEZ, would arrive to deliver the drugs and firearms. In total, from March 2025, through October 2025, investigators conducted five gun and drug transactions in which they purchased a total of eight firearms, 100.8 grams of fentanyl, and 114.4 grams of cocaine from PEREZ DIAZ and MARTINEZ GAMEZ. Both PEREZ DIAZ and MARTINEZ GAMEZ, and the events related to those controlled buys, are charged in *United States v. Perez Diaz et al.,* CR25-211 JNW.

7.      During the two most recent controlled buys, both of which involved cocaine, investigators identified PEREZ DIAZ and MARTINEZ GAMEZ's cocaine source of supply who was distributing cocaine out of 12731 30th Ave NE, Unit #2, Seattle, WA (hereinafter "Unit #2").

8.      On October 27, 2025, the Honorable Brian A. Tsuchida authorized the search of Unit #2. The following day, investigators executed the warrant and recovered, from Unit #2, 746.5 grams (gross weight) of a substance that field-tested positive for cocaine, and 455.4 grams (gross weight) of a substance that field-tested positive for methamphetamine. The sole occupant of Unit #2 was identified as RONI LICONA ESCOTO.

## STATEMENT OF PROBABLE CAUSE

**A.      Prior Controlled Buys of Fentanyl and Firearms from PEREZ DIAZ and MARTINEZ GAMEZ**

9.      On March 27, 2025, CS1 purchased two firearms and a sample of fentanyl from PEREZ DIAZ and MARTINEZ GAMEZ.

10.     On May 8, 2025, CS1 purchased one firearm and two ounces of fentanyl powder from PEREZ DIAZ and MARTINEZ GAMEZ.

11.     On June 4, 2025, CS1 purchased two firearms and two ounces of fentanyl powder from PEREZ DIAZ and MARTINEZ GAMEZ.

//

//

Complaint - 6
*United States v. Licona Escoto* / MJ25-678

**B.    Controlled Purchase of Cocaine and Two Firearms from PEREZ DIAZ and MARTINEZ GAMEZ on July 23, 2025**

12.    Prior to July 23, 2025, CS1 communicated with PEREZ DIAZ via the WhatsApp account associated with 206-376-2441 (hereinafter "TT18") regarding a purchase of narcotics and firearms.

13.    On July 23, 2025, CS1 and PEREZ DIAZ agreed that this purchase would include an ounce of fentanyl and two handguns. CS1 and PEREZ DIAZ further agreed that the deal would occur that day at the same location as their last deal—a parking lot in Tukwila near Southcenter Mall.

14.    On July 23, 2025, at 6:30 p.m., investigators observed that GPS location data for TT18 placed the device in the vicinity of the Auburn residence shared by PEREZ DIAZ and MARTINEZ GAMEZ. At 6:45 p.m., investigators established surveillance in the area and at 6:48 p.m., investigators observed the GPS location data for TT18 had moved to be in the vicinity of ARCO gas station located at 27202 Pacific Hwy S, Federal Way, WA.

15.    At 7:20 p.m., SA Parr observed MARTINEZ GAMEZ standing near a black Infiniti G37, bearing Washington license plate CTA4882 (hereinafter "TV10"), which was parked at the gas pumps. SA Parr also observed PEREZ DIAZ in the passenger seat of TV10. TV10 is registered to MARTINEZ GAMEZ at his Auburn residence.

16.    Between 7:35 p.m. and 8:20 p.m., TFO Bourdon observed the GPS location for PEREZ DIAZ (TT18) and MARTINEZ GAMEZ's phone 206-488-4148 (hereinafter "TT15") moving north along I-5.[2]

17.    At 7:50 p.m., SA Parr, SA Seidel, and TFO Bourdon met with CS1 at a staging location. Investigators searched CS1's person and vehicle. No contraband was found.

---

[2] Beginning at 6:30 p.m. on July 23, 2025, and continuing until 11:30 p.m. that night, investigators observed the GPS location pings for TT15 (MARTINEZ GAMEZ) and TT18 (PEREZ DIAZ) to be traveling together.

Complaint - 7
*United States v. Licona Escoto* / MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

18.     At 8:09 p.m., under the direction of investigators, CS1 placed a recorded call to PEREZ DIAZ (TT18) over WhatsApp to confirm the deal. During a subsequent call and text messages, CS1 and PEREZ DIAZ agreed to change the order from one ounce of fentanyl to one ounce of cocaine. This change was made because PEREZ DIAZ claimed that she currently only had cocaine.

19.     At 8:32 p.m., TFO Bourdon observed the GPS location for TT18 to be near the intersection of NE 127th St and 28th Ave NE in Lake City, Seattle, WA. Investigators moved towards this location.

20.     At 8:50 p.m., SA Williams observed TV10 parked in front of the apartment complex located at 12731 30th Ave NE, Seattle, WA (where Unit #2 is located). Around this time, SA Williams also observed PEREZ DIAZ and MARTINEZ GAMEZ walking from the courtyard of the complex to TV10, at which time MARTINEZ GAMEZ got in the driver's seat and PEREZ DIAZ got in the passenger seat. SA Williams then observed TV10 leave the gravel lot.

21.     At 8:55 p.m., investigators instructed CS1 to place another call to PEREZ DIAZ (TT18) and for CS1 to request another ounce of cocaine from PEREZ DIAZ. During this call, recorded and monitored by investigators, PEREZ DIAZ informed CS1 that she had to go back to the source to get the additional ounce.[3] Investigators then provided CS1 with $1,500 of law enforcement funds for the purchase of the two ounces of cocaine from PEREZ DIAZ, as well as $900 of law enforcement funds for the firearms.

22.     At 9:00 p.m., SA Williams observed TV10 return and park in front of the apartment complex where Unit #2 is located. Shortly after, SA Williams observed MARTINEZ GAMEZ exit TV10 and walk to the courtyard area of the complex. SA Williams then observed MARTINEZ GAMEZ standing near the open door for Unit #2.

---

[3] As detailed further herein, investigators believe that following CS1's call with PEREZ DIAZ, MARTINEZ GAMEZ then contacted LICONA ESCOTO (TT21) to acquire the second ounce of cocaine.

Complaint - 8
*United States v. Licona Escoto /* MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SA Williams observed that MARTINEZ GAMEZ was interacting with and/or exchanging something with an unknown, older male in the door frame, who has now been identified as LICONA ESCOTO. Shortly after, SA Williams observed MARTINEZ GAMEZ return to TV10 and drive away from the complex. Around this time, at 9:18 p.m., investigators observed the GPS locations for TT18 to move south along I-5 away from the area.

23.     At 9:28 p.m., SA Seidel and SA Parr equipped CS1 with video and recording devices and, with TFO Bourdon, traveled with CS1 as he/she drove from the staging location to the planned meet location in Tukwila, WA.

24.     At 9:33 p.m., SPD Det. Branham observed CS1 arrive at the planned location and park. At 9:45 p.m., SPD Det. Branham observed TV10 arrive and park a few spots away from CS1, facing the opposite direction. Det. Branham then observed PEREZ DIAZ exit from TV10's passenger seat with a small object in her hands, walk over to CS1's vehicle, and get in the passenger seat of CS1's vehicle.

25.     At 9:48 p.m., Det. Branham observed PEREZ DIAZ exit CS1's vehicle with nothing in her hands and get back into the passenger seat of TV10. A minute later, Det. Branham observed TV10 drive away. While PEREZ DIAZ was in CS1's vehicle, she delivered to CS1 two handguns and a white powdery substance, later tested by the DEA lab and determined to be 55.7 grams of cocaine. *See* photographs below of PEREZ DIAZ meeting with CS1 and the two handguns and two pounces of cocaine she delivered.



26.     While other investigators maintained surveillance of TV10, SA Parr, SA Seidel, and TFO Bourdon followed CS1 as CS1 traveled from the deal location to a debrief location. At the debrief location investigators searched CS1 and CS1's vehicle. No

Complaint - 9
*United States v. Licona Escoto / MJ25-678*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

contraband was found. Investigators then took custody of the suspected cocaine and two handguns from CS1.

27.    At 10:29 p.m., SA Stark observed TV10 arrive at the Auburn residence shared by PEREZ DIAZ and MARTINEZ GAMEZ. SA Stark then observed both MARTINEZ GAMEZ and PEREZ DIAZ get out of the vehicle and walk into their residence.

**C.    Toll analysis shows that TT21 is a top contact of MARTINEZ GAMEZ (TT15) during the controlled purchase on July 23, 2025**

28.    After the controlled purchase on July 23, 2025, investigators conducted a review of WhatsApp PRTT data for MARTINEZ GAMEZ's phone (TT15). During the months of July and August 2025, investigators observed that TT15 (MARTINEZ GAMEZ) had 58 contacts with a WhatsApp account associated with 206-251-1374 (TT21)[4]; 36 of these were on July 23, 2025, and 27 of these were between 6:35 p.m. and 9:08 p.m., i.e., the timeframe of the controlled purchase of firearms and cocaine discussed above. Of note, TT15 (MARTINEZ GAMEZ) had no other contacts during this period.

29.    Investigators also conducted a review of WhatsApp PRTT data for TT15 (MARTINEZ GAMEZ) and TT18 (PEREZ DIAZ) on July 23, 2025, during the time investigators observed MARTINEZ GAMEZ and PEREZ DIAZ at the apartment complex located at 12731 30th Ave NE, Seattle, WA, where MARTINEZ GAMEZ was observed met with LICONA ESCOTO at Unit #2. Of note, after a call from CS1 to TT18 (PEREZ DIAZ) at 8:55 p.m. (when CS1 requested the additional ounce of cocaine from PEREZ DIAZ), TT15 (MARTINEZ GAMEZ) had four contacts with TT21 from 8:57 p.m. to 8:58 p.m. In total, TT15 and TT21 had 13 contacts between 8:57 p.m. and 9:08 p.m.[5]

---

[4] TT21 is a cellular telephone serviced by T-Mobile for which there is no subscriber information.
[5] Investigators also conducted a review of WhatsApp PRTT data for TT18 during this timeframe. The only contact during the window 6:25 p.m. through 9:08 p.m. was the WhatsApp account operated by CS1.

Complaint - 10
*United States v. Licona Escoto* / MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.    Based on the contact between TT15 and TT21 on the night of July 23, 2025, specifically the contacts immediately after CS1's call with PEREZ DIAZ (TT18) requesting another ounce of cocaine, combined with the lack of contacts with TT18 (PEREZ DIAZ) and anyone besides CS1, investigators believe that the user of TT21 is LICONA ESCOTO who investigators observed outside Unit #2 conducting an exchange with MARTINEZ GAMEZ (as discussed above). Investigators further believe that LICONA ESCOTO supplied MARTINEZ GAMEZ the two ounces of cocaine that MARTINEZ GAMEZ distributed to CS1 on July 23, 2025.

**D.    Controlled Purchase of Cocaine and a Firearm from PEREZ DIAZ and MARTINEZ GAMEZ on October 2, 2025**

31.    Prior to October 2, 2025, CS1 communicated with Marisol PEREZ DIAZ, who was using the WhatsApp account associated with the phone number 206-376-2441 (TT18). CS1 and PEREZ DIAZ originally arranged for a purchase of two ounces of powdered fentanyl and one handgun, set to occur on October 2, 2025.

32.    On October 2, 2025, investigators observed that the GPS location pings for both TT15 (MARTINEZ GAMEZ) and TT18 (PEREZ DIAZ) were in the vicinity of their Auburn residence. At 4:15 p.m., investigators established surveillance near their home.

33.    At 6:15 p.m., SA Parr, SA Seidel, and TFO Bourdon met with CS1 at a staging location. Investigators searched CS1's person and vehicle. No contraband was found. SA Parr, SA Seidel, and TFO Bourdon then provided CS1 with $2,100 of law enforcement funds for the purchase of the two ounces of powdered fentanyl and one firearm from PEREZ DIAZ.

34.    At 6:52 p.m., SA Farley observed TV10 leave the Auburn residence and investigators maintained surveillance. Shortly after, SA Williams observed TV10 arrive at the 76 Gas Station at 5011 S 288th St, Auburn, WA, where MARTINEZ GAMEZ walked away from TV19 and into the gas station.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

35.     At 6:59 p.m., TFA Francisco Vasquez observed MARTINEZ GAMEZ return to TV10, and drive away from the gas station. Investigators maintained surveillance on TV10 as TV10 traveled north on I-5.

36.     At 7:39 p.m., SPD Det. Knapp observed TV10 parked outside the apartment complex where Unit #2 is located. At 7:42 p.m., Det. Knapp observed MARTINEZ GAMEZ get out of the driver's seat of TV10 and walk in the direction of Unit #2. At approximately the same time, through remote surveillance, SA Seidel observed the door of Unit #2 open and remain open. SA Seidel then observed a male, believed to be the same male who MARTINEZ GAMEZ met with before the July 23, 2025, deal (now identified as LICONA ESCOTO), standing in the door frame of Unit #2.

37.     At 7:45 p.m., Det. Knapp observed MARTINEZ GAMEZ back in the area of TV10 talking with an unknown male in a gray hoodie (hereafter "UM1"). Det. Knapp then observed both individuals walking in the direction of Unit #2. Shortly thereafter, through remote surveillance, SA Seidel observed MARTINEZ GAMEZ and UM1 approach the open door of Unit #2. SA Seidel then observed MARTINEZ GAMEZ and UM1 entering the front door of Unit #2, which remained open after they entered.

38.     At 7:49 p.m., through remote surveillance, SA Seidel observed MARTINEZ GAMEZ and UM1 exit Unit #2 and walk back in the direction of TV10. Det. Knapp then observed PEREZ DIAZ standing outside of TV10 as MARTINEZ GAMEZ approached the vehicle. MARTINEZ GAMEZ and PEREZ DIAZ entered TV10 and drove away.

39.     Investigators attempted to follow TV10 as it traveled southbound on I-5 but lost physical surveillance. Based upon vehicle tracker data, investigators observed that TV10 began traveling south I-405 (toward the agreed deal location).

40.     At 8:10 p.m., TFO Bourdon, SA Seidel, and SA Parr traveled with CS1 as CS1 traveled from the staging location to the deal location.

41.     At 8:32 p.m., SA Seidel observed the vehicle tracker for TV10 to be in the vicinity of a residence located at 14016 176th Ave SE Renton, WA. Shortly after, through

Complaint - 12
*United States v. Licona Escoto* / MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

vehicle tracker data, investigators observed TV10 traveling back in the direction it had come. At this time, Det. Knapp also physically observed TV10 leaving the area of 14016 176th Ave SE Renton, WA.

42.    At 8:58 p.m., SA Farley observed TV10 arrive at the meet location in Tukwila, WA, and park near CS1's vehicle. Shortly after, SA Farley observed PEREZ DIAZ exit the passenger seat of TV10, approach CS1's vehicle, and enter the passenger seat of CS1's vehicle.

43.    At 9:00 p.m., SA Farley observed PEREZ DIAZ exit CS1's vehicle and return to TV10, entering its passenger seat. Shortly after, investigators observed TV10 leave the area. Investigators maintained surveillance on TV10 until it arrived at their shared Auburn residence. Around this time, surveillance was terminated.

44.    While other investigators maintained surveillance of TV10, SA Parr, SA Seidel, and TFO Bourdon followed CS1 as CS1 traveled from the deal location to a debrief location. At the debrief location investigators searched CS1 and CS1's vehicle. No contraband was found. Investigators then took custody of the drugs and firearm that PEREZ DIAZ had delivered to CS1.

45.    Upon the conclusion of the operation, SA Parr and SA Seidel transported the exhibits to DEA Seattle. Investigators weighed and field-tested the narcotics. The gross weight of the suspected narcotics was 58.7 grams, and the exhibit field-tested positive for the presence of cocaine.[6]

---

[6] As discussed previously, investigators originally ordered two ounces of fentanyl from PEREZ DIAZ. During the debrief with CS1 at the conclusion of the controlled purchase, CS1 informed investigators that PEREZ DIAZ was mad during their conversation in CS1's vehicle. Investigators went back and reviewed communications with PEREZ DIAZ via TT18 and confirmed that CS1 had ordered fentanyl ("feo") for $650 an ounce. Investigators believe that PEREZ DIAZ made a mistake and bought cocaine from LICONA ESCOTO to deliver to CS1 and because the price of cocaine is greater than fentanyl powder, PEREZ DIAZ did not make as much, and perhaps even lost money on the drug deal.

Complaint - 13
*United States v. Licona Escoto / MJ25-678*

### E.    Remote Video Surveillance of Other Suspected Drug Deals – July and August 2025

46.    Investigators also utilized remote surveillance outside Unit #2 to observe what investigators believe, based on their training and experience, to be drug deals in the doorway of Unit #2. Specifically, on August 11, 2025, investigators observed two separate occasions in which an individual interacted with LICONA ESCOTO (who investigators believe, based on size and appearance, is the same individual observed on the July 23, 2025, and October 2, 2025, deals) at or just inside the doorframe of Unit #2. Investigators observed three individuals with the same behavior on August 14, 2025. Investigators note that on both July 23, 2025, and October 2, 2025, they observed MARTINEZ GAMEZ interact with LICONA ESCOTO at or just inside the door when he was being supplied with the cocaine that investigators would later purchase both nights.[7]

### F.    Search of Unit #2 at 12731 30th Ave NE, Seattle, WA

47.    As indicated above, on October 27, 2025, investigators received authorization to search 12731 30th Ave NE, Unit #2, Seattle, WA. This warrant was executed on October 28, 2025. During a search of Unit #2, investigators found 746.5 grams (gross weight) of a substance that field-tested positive for cocaine, and 455.4 grams (gross weight) of a substance that field-tested positive for methamphetamine.

48.    Based upon my training and experience, I know that these amounts of cocaine and methamphetamine are distribution amounts. Furthermore, the manner in which these drugs were packaged (several large bags, as well as several smaller bags) was consistent with possession of these controlled substances for the purpose of distribution.

---

[7] Investigators also note a distinct factor of the pattern that LICONA ESCOTO usually does not close the door when he does these deals. This was particularly evident on October 2, 2025, because although it was dark when MARTINEZ GAMEZ was observed outside Unit #2, the open door backlit him, LICONA ESCOTO, and UM1, such that investigators could better view these individuals during the suspected drug transaction.

Complaint - 14
*United States v. Licona Escoto* / MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CONCLUSION

49.    Based on the above facts, I respectfully submit that there is probable cause to believe that RONI LICONA ESCOTO conspired with others to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and also knowingly and intentionally possessed, with the intent to distribute, and aid and abet the possession of, with the intent to distribute, controlled substances in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

GRAYSON SEIDEL, Complainant
Special Agent, DEA

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the Defendant committed the offenses set forth in the Complaint.

Dated this 28th day of October, 2025.

HON. BRIAN A TSUCHIDA
United States Magistrate Judge

Complaint - 15
*United States v. Licona Escoto /* MJ25-678

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970